Filed 12/15/25  In re W.L. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re W.L., a Person Coming Under the Juvenile Court Law. | H053170 (Santa Clara County Super. Ct. No. 24JD028283) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. K.L., Defendant and Appellant. | |

Appellant K.L. (mother) challenges the juvenile court's dispositional findings and orders removing her four-year-old daughter, W.L., from her care under Welfare and Institutions Code section 300, subdivision (b).[1]  Mother contends that respondent, the Santa Clara County Department of Family and Children's Services (Department), failed to establish by clear and convincing evidence that removal of W.L. was justified.  Mother further contends that, in the absence of such evidence, the juvenile court violated her constitutional rights by ordering the removal.  We affirm.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

# I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

## A.    *The November 2024 Incident*

In late November 2024, law enforcement responded to multiple reports that mother was behaving erratically at a retail store late at night and appeared to be either under the influence or experiencing a mental health crisis.  Several witnesses reported mother yelling, tipping her stroller over with then three-year-old W.L. inside, and causing the child to fall to the ground at least twice.  When the witnesses approached mother, they observed that she threw W.L. into the stroller, left the store, and shoved W.L. into her car.  Mother then drove off at high speeds, swerved off the road, and passed through stop signs.

When law enforcement stopped mother's car, they saw W.L. unbuckled in her car seat.  Mother appeared "[s]uper manic," disheveled, and had difficulty speaking in coherent sentences.  When she spoke, mother exhibited brief moments of clarity but would then lapse into episodes of uncontrollable sobbing, hyperventilation, and anger.  Mother stated that she had been driving for the past day to flee a domestic violence situation, during which W.L. had not eaten.  Law enforcement observed that W.L. appeared malnourished, had possible bruises on her legs, sunken eyes, a dark spot on her face, and possible dried blood on her lips.  Law enforcement placed mother on a section 5150 hold and took W.L. into protective custody.

W.L. was admitted to a hospital for dehydration and assessment of development delays.  The hospital staff observed W.L. to be non-verbal, appeared unfamiliar with solid foods, underweight, and underdeveloped for her age.  The hospital diagnosed W.L. with malnourishment and "failure to thrive" potentially due to neglect and recommended further assessment.

---

[2] W.L.'s alleged father is not a party to this appeal, and the findings pertaining to him are not at issue.  Accordingly, we recite only the background relevant to the juvenile court's findings and orders as it pertains to mother.

A further comprehensive evaluation of W.L. confirmed the diagnosis for "failure to thrive." W.L. was physically underdeveloped for her age, had "dental disease associated with drinking bottles of milk well beyond the first year of life," and exhibited "pervasive developmental delay, including cognitive, speech, and motor delays." While the diagnosing physician did not observe any evidence of physical abuse, the assessment showed that W.L. "has experienced profound neglect, including supervisory and medical neglect, beyond standards in our community." As a result, the physician concluded that W.L. will "require frequent medical appointments, and carefully integrated medical care and therapeutic intervention."

**B.** ***The Initial Dependency Proceedings***

In early December 2024, the Department filed a juvenile dependency petition under section 300, subdivision (b), alleging that W.L. has suffered, or was at substantial risk of suffering, serious physical harm or illness due to mother's inability to provide regular care for the child because of mother's mental illness or substance abuse.

At the detention hearing, questions arose regarding which state had jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), as mother claimed to be a resident of Oklahoma and wanted the case handled there. The court assumed emergency jurisdiction pending further UCCJEA inquiry and found prima facie evidence supporting the petition and W.L.'s continued detention in foster care.

Throughout December 2024 and January 2025, mother objected to her court-appointed attorney and initiated a paternity action in Oklahoma, which resulted in further continuances of the dependency proceedings. During this time, mother declined to engage with the Department until the court resolved the jurisdictional issue, stating she would fully cooperate with the Department once jurisdiction was confirmed. Based on these assurances and her stated commitment to addressing W.L.'s needs, the Department recommended in early January 2025 that W.L. be returned to mother's care under court supervision.

3

Mother, however, did not cooperate with the Department. For example, although she stated she would sign a medical release for W.L., she did not do so, requiring the Department to seek ex parte relief on this issue from the court due to W.L.'s ongoing medical and developmental issues. The court granted the Department's request, noting that "mother's presentation and behavior during hearings—which includes mother's difficulty in answering questions and conversing in a straightforward, linear fashion which does not include lengthy answers which are not necessarily responsive—has made it difficult to make any progress on the outstanding issues."

By late January 2025, the Department revised its recommendation, seeking W.L.'s removal from mother's care with reunification services to be provided. In its updated report to the court, the Department provided the following information: (a) mother was consistently late to visitation, resulting in sessions being cancelled; (b) mother discussed the dependency proceedings with W.L. during her supervised visits, despite repeated warnings to refrain from doing so; (c) mother declined to participate in a medical visit to address W.L.'s needs ; and (d) mother minimized the severity of W.L.'s developmental delays, maintaining that the child only has a language delay. The Department further reported that, "mother has not been proactive in her cooperation with the Department's efforts to obtain the child's medical history, has not provided any information that shows the child has had consistent medical care and [h]as not demonstrated capacity to follow through with the child's extensive medical appointments."

In February 2025, the Oklahoma court ceded jurisdiction to this state. Mother thereafter contested the Department's recommendations on both jurisdiction and disposition issues, and the trial court set the matter for a contested hearing.

## C.    *The Contested Hearing*

The contested hearing began on March 12, 2025. Before the hearing, the Department filed updated reports. In the reports, the Department observed that mother did not avail herself to reunification services—such as mental health counseling and

parenting classes—until mid-February 2025, continued to withhold consent for W.L.'s medical care, and persisted to minimize the severity of W.L.'s physical, medical, and developmental delays.

The updated reports also noted that on the day of the November 2024 incident that resulted in W.L.'s removal, mother informed the hospital that she had used methamphetamine earlier that day after driving for almost a week from Oklahoma to California. The hospital staff stated that an "unknown white crystal powdered substance" was found in mother's belongings. Mother tested positive for amphetamines. Mother later admitted to the Department social worker that she used methamphetamines that day to stay awake and had not used the drug since 2018 or 2019.

The updated reports also included recent emails mother sent to the Department where she admitted to "hiding" her prior drug use because she did not want anyone to know and was embarrassed. She admitted to being addicted to the drug in 2018 but entered an intensive outpatient treatment thereafter to address her addiction. Mother apologized for not disclosing the information earlier.

Before the hearing, mother also filed objections to exclude hearsay statements from unidentified third parties in the police reports related to the November 2024 incident. The court found that the statements were admissible under section 355 because they were not being relied on as the sole basis for the court's jurisdictional findings. The court admitted the Department's updated reports, as well as its prior reports related to jurisdiction and disposition, without further objection from the parties.

At the hearing, mother testified that she did not shove or handle W.L. aggressively during the November 2024 incident. She explained that she struggled with a new stroller that did not perform as expected, which caused the stroller to tilt. She rushed out of the store because male patrons at the store were harassing her, and she felt afraid. When law enforcement pulled her over, mother claimed they yelled at her, frightened her, and she had an anxiety attack.

Mother admitted to using methamphetamine that day, explaining it was to stay awake after a weeklong drive from Oklahoma to California. She stated she took "a miniscule amount," and "even the police officers could [not] tell" that she was under the influence.

When questioned about W.L.'s physical appearance that day, mother stated that her child's sunken eyes were probably due to both of them being exhausted from their long drive, that the bruises on W.L.'s legs were due to her being an active toddler, and that law enforcement mistook dried chocolate milk on W.L.'s lips as dried blood.

Mother acknowledged that she "unfortunately" had only been involved in one of W.L.'s medical appointments, claiming she missed earlier ones due to late notice from the Department. Mother admitted that she never had W.L. assessed for developmental delays, and that she did not provide any documentation to the Department to verify that she had taken W.L. to routine physical appointments. Mother said she faced obstacles in obtaining treatment for W.L. because the alleged father refused to provide insurance information, the family moved frequently, and she had financial difficulties. Mother said she delayed participating in her case plan because the court had not yet resolved jurisdiction. She claimed that once the issue was decided, she contacted the Department to begin services but received no response.

D.   *The Court's Findings and Orders*

On March 18, 2025, the juvenile court announced its rulings, stating "there is enough evidence today for this Court to sustain the allegations as they are pled and to find clear and convincing evidence supporting removal of W.L. from the care of her mother."[3] The court expressed concerns about "the series of bad decisions" made by

---

[3] At the time the court announced its ruling, the petition did not include any allegations pertaining to mother's admission of methamphetamine use on the day of the November 2024 incident. W.L.'s counsel requested such information be included in the petition, which the court allowed and directed the Department to file an amended petition

6

mother—for instance, driving long distance with W.L. without a plan and purchasing and consuming methamphetamines—that ultimately led to the November 2024 incident. While mother's explanations for W.L.'s physical appearance might have been plausible, the court noted that W.L.'s unaddressed "developmental issues and delays" could not be so "easily explained." The court referred to the number of concerns raised by the diagnosing physician regarding W.L.'s physical and developmental delays in its comprehensive evaluation of the child. The court found that W.L. could not get the intervention and care she needs while in mother's care.

The juvenile court adopted the Department's recommended jurisdictional findings and disposition orders, which included findings that there was or would be substantial danger to the physical health, safety, protection or physical or emotional well-being of the child if she were returned home, and there were no reasonable means to protect the child's physical health without removal. The court adjudged W.L. a dependent of the court, and adopted the recommended case plan, which ordered visitation between mother and W.L. at the Department's discretion.

Mother timely appealed from the court's order.

## II.    DISCUSSION

Mother does not dispute the court's jurisdictional findings. She instead makes the following two arguments: (a) the evidence was insufficient to justify W.L.'s removal; and (b) that the order removing W.L. from her care, in the absence of substantial evidence, violated her constitutional rights.

### A.    *Legal Principles and Standard of Review*

"To order a child removed from their parents' physical custody under section 361(c)(1), the juvenile court must find by clear and convincing evidence that (1) there 'would be a substantial danger to the physical health, safety, protection, or physical or

accordingly. Mother's counsel did not object to the amendment in court. Mother has also not raised any argument on appeal with respect to the amended petition.

7

emotional well-being' of the child in the parents' home, and (2) 'there are no reasonable means by which the [child's] physical health can be protected without' removal." (*In re Zoe H*. (2024) 104 Cal.App.5th 58, 71, quoting § 361, subd. (c).) The court may consider the parent's " 'past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention.' [Citation.]" (*In re M.D.* (2023) 93 Cal.App.5th 836, 856.)

We keep in mind that the purpose of a dependency proceeding is not to prosecute a parent, but rather to ensure the safety, protection, and physical and emotional well-being of children who are at risk of being abused or neglected. (§ 300.2; *In re Alexis H.* (2005) 132 Cal.App.4th 11, 16.) " 'The purpose of dependency proceedings is to prevent risk, not ignore it.' [Citation.]" (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.) " 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

We review the court's rulings for substantial evidence. (*In re M.D.*, *supra*, 93 Cal.App.5th at p. 857.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question . . . is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012 (*O.B.*).)

**B.** *Sufficiency of the Evidence*

Here, the record contains substantial evidence from which the juvenile court could have found it highly probable that there were no reasonable means to protect W.L. without removing her from mother's care.

There was ample evidence that W.L. had been subjected to "profound neglect" while in mother's care. At age three when she was initially removed, W.L. was mostly non-verbal, underweight and underdeveloped, suffered from dental disease, and exhibited behaviors and symptoms consistent with being bottle fed for most of her life. No evidence showed that mother arranged or attended routine medical appointments for W.L.; rather, she attributed the lack of care to W.L.'s alleged father's failure to provide insurance coverage. W.L. was reported to have significant developmental delays in cognition, speech, and motor skills. Mother acknowledged some concerns, such as W.L. being non-verbal and avoiding eye contact, but did not agree with the Department's assessment of the extent of W.L.'s developmental issues. Mother denied responsibility for W.L.'s physical condition and her signs of neglect, and failed to provide timely consent for certain medical and developmental services recommended by the Department to help assess and treat W.L.'s needs.

Additionally, substantial evidence indicated that mother did not recognize the seriousness of the November 2024 incident and remained unwilling to accept responsibility for her actions. (*In re N.M.* (2011) 197 Cal.App.4th 159, 170 [substantial evidence supported removal where the parent failed to recognize the seriousness of an incident and denied responsibility].) Although mother admitted shortly before the contested hearing that she had used methamphetamine on the day of the November 2024 incident, at the hearing she downplayed its role in the events that occurred. She stated she had taken only a "minuscule amount," which she claimed law enforcement could not detect when she was placed on a 5150 hold. Mother denied handling W.L. roughly, attributing the stroller's unexpected movement as the cause for tipping over. She denied shoving W.L. into the car, explaining that she hurried to leave the store because she felt harassed and frightened by male patrons. Additionally, she denied driving recklessly with W.L. unbuckled, asserting that she had been frightened by law enforcement and suffered a panic attack.

9

Based on this record, there was substantial evidence for the court to reasonably find there would be substantial danger to W.L.'s physical health and safety in mother's home, and there were no reasonable means short of removal by which W.L.'s physical health could be protected.

Mother argues that the court failed to consider alternatives to removal, such as releasing W.L. to her care under a family maintenance plan (as the Department initially recommended) with increased social worker oversight, or requiring mother to continue to engage in mental health services and abstain from drugs. But substantial evidence supports the juvenile court's finding that W.L.'s removal was necessary and that no reasonable alternative remained after mother was afforded numerous opportunities to engage in reunification services but failed to do so. Although mother repeatedly expressed an intent to cooperate, her actions consistently undermined the Department's efforts to assist her and W.L. She refused to timely authorize the release of medical information, concealed her drug use for several months, and took steps that delayed the dependency proceedings, including initiating a paternity action in Oklahoma after the dependency case had commenced in California.

Moreover, in the four months while proceedings remained in hiatus, mother declined to participate in services offered by the Department and continued to deny any responsibility for the circumstances that brought W.L. under the court's supervision. Even at the contested hearing, mother continued to deny responsibility for W.L.'s condition and the November 2024 incident, as discussed above.

On appeal, mother asserts that she "has participated in her case plan." But she cites no evidence in the record to support this assertion. In any event, the Department counters that mother had only recently initiated services, and thus it was premature to assess her commitment to completing the case plan.

In light of mother's repeated noncompliance and her continued failure to acknowledge the risks to W.L., the juvenile court could reasonably conclude that removal

10

was necessary and that mother's proposed alternatives would not have adequately ensured W.L.'s safety.  (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["[o]ne cannot correct a problem one fails to acknowledge"].)  Accordingly, we conclude that the record contains substantial evidence from which a reasonable fact finder could have found it highly probable that there would be a substantial danger to W.L.'s physical health and safety if she remained in mother's care, and there was no reasonable means to protect W.L. without removal.

We note that the record demonstrates that mother loves W.L., and W.L. loves mother.  But as stated above, we conclude that substantial evidence supports the juvenile court's finding that there were no reasonable means of protecting W.L. from harm other than removal.  (*O.B., supra,* 9 Cal.5th at pp. 1011-1012.)

C.      ***Constitutional Arguments***

Mother also contends that "W.L.'s removal, in the absence of substantial evidence, violated Mother's rights under the Fourth and Fourteenth Amendments."

We recognize that "parents have a fundamental liberty interest in the companionship, care, custody, and management of their children" which entitle them to certain due process protections, such as notice and a right to a meaningful hearing on certain issues.  (*In re J.R.* (2022) 82 Cal.App.5th 569, 572; *In re Daniela G.* (2018) 23 Cal.App.5th 1083, 1092.)

However, there is no evidence that mother's rights were violated in this case. Mother's argument is based on the premise that there was insufficient evidence to support removal.  For the reasons stated above, we do not find merit to mother's contention and, therefore, her constitutional arguments likewise fail.

### III.    DISPOSITION

The jurisdictional findings and disposition orders, including the order removing W.L. from mother's care, entered March 18, 2025 are affirmed.

_____<br>KULKARNI, J.*

WE CONCUR:

_____<br>
GREENWOOD P. J.

_____<br>
GROVER, J.

*In re W.L.; Santa Clara County DFCS v. K.L.*

H053170

---

* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.